# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MARIO H. JARAMILLO and
GUSTAVO ANDRES PEREZ, *also
known as* Gustavo Perez and Ocampo
Gustavo Perez

CRIMINAL CASE NO.

1:13-cr-00308-JEC-RGV

## FINAL REPORT, RECOMMENDATION, AND
## ORDER ON DEFENDANTS' PRETRIAL MOTIONS

Defendants Mario H. Jaramillo ("Jaramillo") and Gustavo Andres Perez

("Perez"), collectively referred to as "defendants," are charged in a seven-count

indictment with conspiring to possess fifteen or more unauthorized access devices

and to traffic in and use one or more such devices with intent to defraud, in

violation of 18 U.S.C. §§ 1029(a)(2)-(3); aiding and abetting each other in possessing

fifteen or more unauthorized access devices with intent to defraud, in violation of

18 U.S.C. §§ 1029(a)(2)-(3); aiding and abetting each other with intent to defraud by

trafficking in and using one or more unauthorized access devices, in violation of 18

U.S.C. §§ 1029(a)(2) and 2; and four counts of aggravated identity theft, in violation

of 18 U.S.C. §§ 1028A and 2.  [Doc. 1].[1]  Jaramillo has moved to suppress evidence and statements obtained as a result of a traffic stop that occurred on April 12, 2012, [Doc. 27], which Perez has moved to adopt, [Doc. 28].  Following an evidentiary hearing held on January 27, 2014,[2] the parties filed post-hearing briefs on the motions.  [Docs. 39, 42, & 43].  For the following reasons, Perez's motion to adopt, [Doc. 28], is **GRANTED**, and it is **RECOMMENDED** that defendants' motion to suppress evidence and statements, [Doc. 27], be **DENIED**.

## I.  STATEMENT OF FACTS

On April 12, 2012, at approximately 8:56 p.m., uniformed Georgia State Patrol Trooper Olin Lundy ("Trooper Lundy"),[3] was monitoring traffic from the median along State Road 16 in Spalding County when he observed a white Chevrolet Tahoe (the "Tahoe"), with a Florida license plate, traveling at a high rate of speed, which radar indicated was 72 mph in a 55 mph zone, in violation of O.C.G.A. § 40-6-181.

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 38] for a transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the parties submitted exhibits, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for defendants' exhibits.

[3] At the time of the evidentiary hearing, Trooper Lundy had been employed as a trooper with the State of Georgia for about ten years.  (Tr. at 3).

(Tr. at 3-4, 20-21).[4]  Upon confirming the speeding violation, Trooper Lundy immediately activated the blue lights on his patrol vehicle and initiated a traffic stop of the Tahoe.[5]  (Tr. at 4, 21-22).

Trooper Lundy exited his patrol car, approached the driver's side of the Tahoe, and asked the driver, later identified as Jaramillo, for his driver's license and registration.  (Tr. at 4, 24; Def. Ex. 1, (File 1a) at 2.02).  Trooper Lundy observed that Jaramillo appeared nervous and shaking while handing him his license and the rental agreement for the Tahoe, and he also noticed that there were four cellular telephones present in the vehicle, of which at least three were placed in the center

_____

[4] O.C.G.A. § 40-6-181 provides in relevant part that "no person shall drive a vehicle at a speed in excess of the [] maximum limits" specified therein.  O.C.G.A. § 40-6-181(b).

[5] Both the government and defendant Jaramillo introduced as an exhibit at the evidentiary hearing a video recording depicting the traffic stop in question.  See (Gov. Ex. 1; Def. Ex. 1).  Additionally, Trooper Lundy wore a microphone on his belt and therefore any conversations that occurred in close proximity to him were captured on the video recording.  (Tr. at 23); see generally (Def. Ex. 1).  Jaramillo's counsel requested that he be able to refer to his copy of the video recording in his post-hearing brief, see (Tr. at 55), and after some discussion, the Court directed the parties to compare both video recordings to ensure they are the same and to refer to Jaramillo's copy if there is no discrepancy between the two, see (Tr. at 55-56).  Although the government was not in possession of Jaramillo's copy at the time its post-hearing brief was due, see [Doc. 39 at 5 n.1], it does not appear that there are any material discrepancies between the two recordings.  Therefore, for purposes of ruling on defendants' motion to suppress, the Court will refer to Jaramillo's copy of the video recording, which contains four separate media files.  See (Def. Ex. 1, Files 1a, 1b, 2, & 3).

console.[6]  (Tr. at 4-5, 25-27).  Trooper Lundy asked Jaramillo to exit the Tahoe,[7] and

he testified that Jaramillo "hesitated a little bit" and "fumbled with the door," which

Trooper Lundy attributed to nervousness and a "little bit of a language barrier."  (Tr.

at 4, 6, 25, 27, 61; Def. Ex. 1, (File 1a) at 2:15).  While at the rear of the Tahoe, Trooper

Lundy asked Jaramillo where they were traveling to,[8] and Jaramillo said that they

were going to "75" and "to Atlanta," that they came from Miami, and that Perez was

his boss and that the purpose of the trip was for their work installing Internet.[9]  (Tr.

_____

[6] When asked whether the presence of four cell phones raised any suspicions, Trooper Lundy responded, "Yes, most people don't carry, unless they are, you know, provided one for work or something like that an extra one, I don't think most people carry two cellphones."  (Tr. at 5).  He further explained that "a lot of times[,] extra cellphones could be used for conducting illicit activities," such as narcotics trafficking.  (Tr. at 6).

[7] Trooper Lundy initially testified that he asked Jaramillo to exit the vehicle because there was a passenger, later identified as Perez, "and it seemed like [he] was getting more answers from the passenger" and that he "wanted to separate the two of them."  (Tr. at 6).  However, Trooper Lundy later clarified his testimony and stated that he had no interaction with Perez until he approached him at the passenger side window, but that he asked Jaramillo to exit the vehicle because if he asked a question, Perez could answer so he was trying to separate them and that it was a practice he used occasionally during traffic stops when he thought "something may be up[.]"  (Tr. at 24-25, 29-30).

[8] Trooper Lundy testified that he always asked questions concerning the driver's origin and destination to "see if there's any justification for speeding. . . . You know, if they're on the way to the hospital, I'd like to not delay them, you know, any more than I have to."  (Tr. at 17).

[9] As depicted on the video recording, Jaramillo exhibited some difficulty either hearing or understanding what he was being asked and he informed Trooper

Case 1:13-cr-00308-WSD-RGV   Document 45   Filed 04/25/14   Page 5 of 36

at 6, 31-33, 57; Def. Ex. 1, (File 1a) at 2:34-3:32).   Trooper Lundy asked Jaramillo

whether he had rented the Tahoe, which Jaramillo confirmed he had, and Trooper

Lundy then explained the basis for the traffic stop.  (Def. Ex. 1, (File 1a) at 3:49-4:00).

After speaking with Jaramillo, Trooper Lundy approached the passenger side

window of the Tahoe and asked Perez if he spoke English and about his travel plans,

and Perez informed him that he spoke English, that they were going back home to

Miami after having been in Atlanta celebrating his birthday with friends, and that

the GPS navigation system had them lost as they were trying to reach 75, and he

then provided Trooper Lundy his driver's license.  (Tr. at 6-7, 33-35, 61, 63; Def. Ex.

1, (File 1a) at 4:29-5:32).  Trooper Lundy explained to Perez the reason for the traffic

stop and then told him he would be back in a minute.  (Def. Ex. 1, (File 1a) at 5:35-

5:46).

Recognizing some inconsistency in their travel plans and stated purpose of

their travel, Trooper Lundy, who testified that he was not sure whether this initial

inconsistency was due to the language barrier with Jaramillo, returned to Jaramillo

and asked him again where he was going and Jaramillo eventually indicated they

were going from Atlanta to Miami.  (Tr. at 6-7, 32, 35-36, 60; Def. Ex. 1, (File 1a) at

5:50-6:12).  Trooper Lundy then requested that Jaramillo remain standing in front of

---

Lundy that he did not "speak English well."  (Def. Ex. 1, (File 1a) at 2:56); see also
(Tr. at 31-32).

his patrol vehicle and he returned to his vehicle and immediately radioed dispatch for a K-9 unit.[10]  (Tr. at 7-9, 36-37; Def. Ex. 1, (File 1a) at 6:18-7:03).  Trooper Lundy also ran defendants' licenses through the Georgia Crime Information Center ("GCIC") database, both of which came back clean, and he checked the vehicle's registration.  (Tr. at 7, 39-41, 43; Def. Exs. 2 & 3).  He also printed a warning for speeding and prepared a consent to search form on the computer in his patrol car and printed the form in Spanish.[11]  (Tr. at 9, 42-43; Gov. Ex. 2).

Subsequently, Trooper Lundy exited his patrol vehicle and approached Jaramillo and asked him additional questions about his travel, including how long he had stayed in Atlanta, and Jaramillo told him that he had been in Atlanta for two days for Perez's birthday.  (Tr. at 9-10, 39, 44; Def. Ex. 1, (File 1a) at 13:32-13:54).

---

[10] Trooper Lundy testified that he called for a K-9 unit because he suspected the defendants were involved in criminal activity based on Jaramillo's nervousness, the number of cell phones in the center console of the Tahoe, the inconsistent statements regarding their travel plans, and because the travel destinations of Atlanta and Miami are known to be source cities for narcotics.  (Tr. at 8-9, 18, 59). He also explained that he knew he was going to ask for consent to search the Tahoe, and that in the event defendants refused, he would have a K-9 unit available as backup.  (Tr. at 8, 38, 66-67).  At the time he contacted dispatch for a K-9 unit, the unit was approximately 10 to 15 minutes away from the scene of the traffic stop.  (Tr. at 8, 46-47).

[11] From the time stamps on the documents admitted at the evidentiary hearing, it appears that Trooper Lundy ran the driver's licenses through GCIC at 9:03 p.m., that he printed the Spanish consent to search form off his computer at 9:06 p.m., and he received a clean report on the licenses at 9:07 p.m.  (Tr. at 41-42; Gov. Ex. 2; Def. Exs. 2 & 3).

Trooper Lundy then explained to Jaramillo that he was going to warn him for speeding and then handed him his driver's license along with the warning citation. (Tr. at 9, 43-44; Def. Ex. 1, (File 1a) at 13:55-14:15). While Jaramillo remained standing at the rear of the Tahoe, Trooper Lundy then approached Perez at the passenger side window and returned his driver's license, explained that he was issuing them a warning for speeding, and then asked Perez how long they had been in Atlanta and where they had stayed. (Tr. at 9-10, 44-45; Def. Ex. 1, (File 1a) at 14:16-14:33). Perez replied that they had been there for a week for his birthday and that they had stayed at the Marriott hotel near Lenox Square and had just visited the aquarium that day. (Tr. at 10, 39, 45, 61; Def. Ex. 1, (File 1a) at 14:34-15:10). Trooper Lundy also asked Perez how old he was and he replied that he was 29 years old, and Trooper Lundy then turned to walk back to Jaramillo, stating "Okay, I'll get you all going here in just a second, okay." (Tr. at 46; Def. Ex. 1, (File 1a) at 15:12-15:22).

As he was returning to Jaramillo, Trooper Lundy realized that he had left the rental agreement for the Tahoe in his patrol vehicle so he retrieved it and, prior to handing it back to Jaramillo, he reviewed it and noticed that the vehicle was rented approximately three weeks prior to the traffic stop and was a week and a half overdue, which also "raised a red flag." (Tr. at 9, 11, 47-48, 51-52; Def. Ex. 1, (File 1a) at 15:24-16:39). At this point, approximately 16 minutes had passed since the

initiation of the traffic stop, and Trooper Lundy handed the rental agreement to Jaramillo and stated, "You all be careful."  (Tr. at 12, 48-49; Def. Ex. 1, (File 1a) at 16:38-16:44).  As Jaramillo turned to walk back to the Tahoe, Trooper Lundy then asked, "You all don't have any drugs or weapons or anything like that in there," and Jaramillo responded, "No."  (Tr. at 12, 49; Def. Ex. 1, (File 1a) at 16:49-16:57).  Trooper Lundy then asked Jaramillo if he would mind if he searched the Tahoe, and when Jaramillo indicated that he did not understand what was being asked, Trooper Lundy repeated himself, pointed to his eyes and the Tahoe, and stated, "Look in your vehicle."  (Tr. at 12-13, 50, 64; Def. Ex. 1, (File 1a) at 16:58-17:21).  Jaramillo responded, "Yeah, yeah."  (Tr. at 50; Def. Ex. 1, (File 1a) at 17:21-17:22).  Trooper Lundy again asked, "Are you okay with that," and Jaramillo shrugged his shoulders.  (Def. Ex. 1, (File 1a) at 17:22-17:26).

At this time, Trooper Lundy provided Jaramillo with the Spanish consent to search form and asked Jaramillo if he could read Spanish or English, and once Jaramillo confirmed that he could read Spanish, Trooper Lundy asked Jaramillo to read the form aloud, which he did.[12]  (Tr. at 13, 50-51, 64; Gov. Ex. 2; Def. Ex. 1, (File

---

[12] Jaramillo began to read the Spanish consent to search form, stopped, looked up, and asked Trooper Lundy, while also pointing at him and then himself, "to read, for you, or for me?"  (Def. Ex. 1, (File 1a) at 17:38-17:41).  Trooper Lundy answered, "No, no, for you . . . make sure you understand."  (Def. Ex. 1, (File 1a) at 17:41-17:45).  Trooper Lundy also testified that since Jaramillo had rented the Tahoe in his name and was the driver of the vehicle at the time of the traffic stop, he wanted to obtain

1a) at 17:27-19:01).   After reading the form aloud, Jaramillo indicated that he understood what he had just read, agreed to consent, and then placed his signature at the bottom of the form.   (Tr. at 13, 19, 51, 64-65; Gov. Ex. 2; Def. Ex. 1, (File 1a) at 19:01-19:33).[13]

     After Jaramillo signed the consent to search form, Trooper Lundy asked Perez to exit the Tahoe, informed him that Jaramillo had consented to a search of the

------

his consent.   (Tr. at 65-66, 69).

    [13] At the evidentiary hearing, the government admitted the Spanish consent to search form Jaramillo read and signed, see (Tr. at 14; Gov. Ex. 2), as well as a copy of the form containing both the English and Spanish versions of the consent to search form, see (Tr. at 14-15; Gov. Ex. 3).  According to the English version of the form, the Spanish consent to search form signed by Jaramillo provides in relevant part as follows:

> I, MARIO H JARAMILLO, hereby grant my consent to LINDY, O., Troopers of the Georgia State Patrol to search the following described vehicle including luggage, containers, and contents of all.  This includes the removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purpose of concealing contraband.
>
>        . . .
>
> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form.  I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.
>
> My consent is freely and voluntarily given.

(Gov. Exs. 2 & 3).

vehicle, and asked him whether there were any drugs or large sums of money present in the Tahoe and whether either of them had any weapons. (Tr. at 15, 51, 70; Def. Ex. 1, (File 1a) at 19:53-20:36). He also performed a pat down search of both defendants for officer safety. (Tr. at 15-16, 51, 53; Def. Ex. 1, (File 1a) at 20:36-21:05). While awaiting backup, Trooper Lundy asked Perez what all they had in the Tahoe, and Perez described luggage and bags and then asked Trooper Lundy whether he wanted him to open the rear hatch, to which Trooper Lundy responded, "No, that's fine." (Def. Ex. 1, (File 1a) at 21:13-21:22). Trooper Lundy also asked defendants whether all of the stuff in the vehicle belonged to them, and Perez provided an affirmative response. (Def. Ex. 1, (File 1a) at 21:40-21:47).

Approximately five minutes after obtaining consent to search the vehicle, Corporal Howard Spitzer ("Corporal Spitzer"), and his partner Officer Sam Torres ("Officer Torres"), with the Spalding County Sheriff's Office Special Operations Narcotics Division, arrived on the scene and, after a brief conversation with Trooper Lundy, they approached the defendants and Corporal Spitzer asked them in Spanish whether there were drugs or large amounts of cash in the Tahoe and whether he could search the vehicle. (Tr. at 16, 18, 52-53, 68, 70-74, 80, 83-84, 92-94; Def. Ex. 1, (File 1a) at 24:51-26:42). Defendants appeared to understand what was being asked of them by Corporal Spitzer and they each consented to Corporal Spitzer's search

10

of the Tahoe.[14]  (Tr. at 74, 80, 83-84; Def. Ex. 1, (File 1a) at 26:42-26:47).  The officers

proceeded to search the vehicle,[15] and they recovered approximately $103,000 in

cash and about 1,000 gift cards.  (Tr. at 18-19, 75-78); see generally (Def. Ex. 1).

During and after the search, which lasted about three hours, the officers explained

to defendants that they were not under arrest at that time and after the officers

inventoried and seized the evidence, they allowed defendants to leave the scene in

the Tahoe.  (Tr. at 53, 77, 81, 85-86); see generally (Def. Ex. 1).  Both Trooper Lundy

and Corporal Spitzer testified that at no time during this incident did any officer

draw their weapon, make any threats, restrain either defendant, or use any force

against either of the defendants.  (Tr. at 19, 74-75, 80); see generally (Def. Ex. 1).

## II.  DISCUSSION

Defendants do not challenge the initial traffic stop on April 12, 2012, for

speeding, but assert that even though the traffic stop was lawful, the subsequent

---

[14] On the video recording, Jaramillo can be seen shrugging his shoulders while
Perez responded, "yeah, that's fine."  See (Def. Ex. 1, (File 1a) at 26:39-26:43).

[15] The officers searched various shopping bags located within the vehicle as
well as luggage, which Perez unlocked for them.  (Tr. at 56, 69, 78-79, 94-95); see
generally (Def. Ex. 1).  Corporal Spitzer also testified that he ran a K-9 around the
Tahoe, that the K-9 alerted to the presence of drug odor on one of the locked
backpacks, and that he performed a search on the El Paso Intelligence Center
database, which revealed that Perez was the subject of a DEA investigation out of
Miami.  (Tr. at 79, 95-98).  He further stated that at no time did either of the
defendants attempt to revoke their consent to search the vehicle or its contents.  (Tr.
at 80).

11

detention was unnecessarily prolonged and not supported by reasonable suspicion.
[Doc. 43 at 2-3, 12-26].  Jaramillo also argues that his consent to search the vehicle
was not valid because it was the product of an illegal detention and not voluntary,
[id. at 26-32], and Perez challenges the search of his locked luggage and shopping
bags as not within the scope of Jaramillo's consent, and Perez further asserts that
even if there was consent, he merely acquiesced to a show of authority, [Doc. 42 at
2, 7-8].  Defendants also seek to suppress any statements that were made, asserting
that they were obtained in violation of their Miranda[16] rights.  [Doc. 43 at 32-35].  The
Court will address each of these arguments.

## A.   The Initial Traffic Stop and Subsequent Detention

"The Fourth Amendment protects individuals from unreasonable search and
seizure."  United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam)
(unpublished) (citation and internal marks omitted).  The "[t]emporary detention of
individuals during the stop of an automobile by the police, even if for only a brief
period and for a limited purpose, constitutes a 'seizure' of 'persons' within the
meaning of [the Fourth Amendment]."  Whren v. United States, 517 U.S. 806, 809-10
(1996) (citations omitted); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th
Cir. 2001);  United States v. Edenilson-Reyes,  Criminal  Action  File  No.

---

[16] See Miranda v. Arizona, 384 U.S. 436 (1966).

1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted

by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a

traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion

in compliance with Terry v. Ohio, 392 U.S. 1 (1968). Edenilson-Reyes, 2010 WL

5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009);

Purcell, 236 F.3d at 1277); see also United States v. Monzon-Gomez, 244 F. App'x

954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172

F.3d 775, 778 (11th Cir. 1999); United States v. Sierra, Cr. No. 2:10cr183–MEF, 2011

WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1

(M.D. Ala. May 4, 2011). Thus, "[a] traffic stop . . . is constitutional if it is either

based upon probable cause to believe a traffic violation has occurred or justified by

reasonable suspicion. . . ." Edenilson-Reyes, 2010 WL 5620439, at *9 (alterations in

original) (citations and internal marks omitted); see also United States v. Boyd, 388

F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); United States v.

Woods, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).[17]

---

[17] An officer's subjective intentions and opinions are irrelevant where the officer has probable cause for the stop. See United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted); see also United States v. Arango, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted) ("Where objectively reasonable conditions permit a stop, the officer's motive in

13

Defendants do not contest that Trooper Lundy lawfully stopped them for speeding in violation of O.C.G.A. § 40-6-181, <u>see</u> [Doc. 43 at 2], and Trooper Lundy's testimony established that he had probable cause to believe that Jaramillo had violated Georgia law, which is "all that is necessary to conduct a traffic stop." <u>United States v. Alvardo</u>, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *5 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 5262735, at *1 (M.D. Fla. Dec. 17, 2010) (citation omitted). Instead, defendants contend that Trooper Lundy unreasonably extended the traffic stop and that this extension was not justified by reasonable suspicion. [Doc. 43 at 12-26; Doc. 42 at 1-2, 5-7]. In response, the government contends that the traffic stop, which lasted 16 minutes, was constitutional and that Trooper Lundy's questioning of defendants, which was within the permissible scope of the traffic stop, did not unreasonably prolong the duration of the stop. [Doc. 39 at 9-15]. Alternatively, the government asserts that any delay was justified by Trooper Lundy's reasonable suspicion. [<u>Id.</u> at 15-18].

"A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation," and "[t]he temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." <u>Arizona</u>

---

making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment."); <u>Miller v. Harget</u>, 458 F.3d 1251, 1260 (11th Cir. 2006) (citations omitted) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed").

14

v. Johnson, 555 U.S. 323, 333 (2009).  "Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave."  Id. (citation omitted).  "[A]n officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place, and the stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity."  United States v. Garcia, 284 F. App'x 791, 794 (11th Cir. 2008) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted).  "[A]n officer may prolong the stop to investigate the driver's license and the vehicle registration and to perform a computer check."  Edenilson-Reyes, 2010 WL 5620439, at *10 (citation omitted).  "The officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong beyond the time reasonably required to complete that mission."  United States v. Cantu, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished) (citation and internal marks omitted).[18]  "When examining the reasonableness of a traffic stop, the length of time before consent is given to search is also relevant."  Garcia, 284 F. App'x at 794

---

[18] That is, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."  Johnson, 555 U.S. at 333 (citation omitted).

(citation omitted). "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." Edenilson-Reyes, 2010 WL 5620439, at *10 (citation and internal marks omitted).

"However, a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. DeJesus, 435 F. App'x 895, 900 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted). That is, "[a]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop." United States v. Gomez Serena, 368 F.3d 1037, 1041 (8th Cir. 2004) (citation omitted). Furthermore, where an officer initiates a legal stop, he has "the duty to investigate suspicious circumstances that then [come] to his attention." Cantu, 227 F. App'x at 785 (alteration in original) (citation and internal marks omitted).

The length of the traffic stop at issue here did not violate either defendant's rights since only "[a]pproximately [sixteen] minutes elapsed between [Trooper

16

Lundy's] approach of the [Tahoe] . . . and [Jaramillo's] consent to search the car[.]" United States v. Santillian, No. 13 Cr. 138(RWS), 2013 WL 4017167, at *7 (S.D.N.Y. Aug. 7, 2013) (citation omitted) (citing United States v. Hernandez, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005) (footnote and internal marks omitted) ("Where at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short . . . Even *if* seven[teen] minutes is some minutes longer than the norm, we question whether the Fourth Amendment's prohibition of unreasonable seizures is concerned with such trifling amounts of time, when the seizure was caused at the outset by an apparent violation of the law. Of trifles the law does not concern itself.")); see also United States v. Ferguson, No. CR 112–255, 2013 WL 3147945, at *7 (S.D. Ga. June 18, 2013), adopted at *1 (citations omitted) ("Sixteen to eighteen minutes is not an unreasonable duration for a traffic stop."). The issue raised by defendants is whether Trooper Lundy's questions measurably extended the duration of the stop such that the stop, which was lawful at its inception, subsequently became unconstitutional.[19]

---

[19] Once Jaramillo consented to the search of the Tahoe, "the clock re-started for purposes of evaluating the reasonableness of the duration of the intrusion." Hernandez, 418 F.3d at 1210 (citation omitted). While Jaramillo challenges whether his consent was voluntary, which will be discussed further herein, neither defendant argues that the search itself lasted an unreasonable length of time, and therefore, "it is only the intermediate period of [sixteen] minutes of detention leading up to the

Trooper Lundy testified that after he approached defendants and asked Jaramillo for his driver's license and registration, he observed that Jaramillo appeared nervous and to be shaking and noticed three or four cell phones in the center console area,[20] and he therefore asked Jaramillo to exit the vehicle in order to separate Jaramillo and Perez while he explained the reason for the stop and inquired as to their travel plans.  (Tr. at 4-6, 25-27, 31-33, 57, 61; Def. Ex. 1, (File 1a) at 2:02-2:15, 2:34-4:00).  Despite Jaramillo's inference that his removal from the vehicle was somehow improper, see [Doc. 43 at 17 ("Any question concerning the reason for

_____

consent to search that [the Court] must evaluate for constitutional reasonableness. Id. (citation omitted).  In fact, "[a]n officer conducting a routine traffic stop may request consent to search the vehicle," United States v. Diaz-Fonseca, No. CR 112–242, 2013 WL 3147903, at *10 (S.D. Ga. June 19, 2013), adopted at *1 (alteration in original) (citations and internal marks omitted), and once "the driver voluntarily consents to a search of his vehicle, the remainder of the detention [is] consensual so long as the scope of the search [does] not exceed the consent given," United States v. Gonzalez, 275 F. App'x 930, 933 (11th Cir. 2008) (per curiam) (unpublished) (alterations in original) (citation and internal marks omitted); see also DeJesus, 435 F. App'x at 901-02; United States v. Ubaldo-Viezca, 398 F. App'x 573, 581 (11th Cir. 2010) (per curiam) (unpublished); Ferguson, 2013 WL 3147945, at *6; United States v. Acosta, 807 F. Supp. 2d 1154, 1201 (N.D. Ga. 2011), adopted at 1168; United States v. Renteria-Pedraza, No. 99–CR–89 S, 1999 WL 33486454, at *7 (D. Utah Nov. 1, 1999) ("When the officer returned the license, citation, and other papers to the defendant, the relationship was no longer one of detention, but it returned to a police citizen encounter and defendant was not seized within the meaning of the Fourth Amendment.").

[20] Trooper Lundy testified that the presence of four cell phones in the Tahoe raised his suspicion that defendants may be involved in criminal activity.  (Tr. at 5-6).

18

speeding could have been cleared up by asking at the car window.")], there is nothing unconstitutional about ordering the driver of a vehicle lawfully detained for a traffic violation to get out of the vehicle, see Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977); see also United States v. Berkley, No. 1:13–cr–157–WSD–01, 2013 WL 6858920, at *4 (N.D. Ga. Dec. 30, 2013); United States v. Smith, No. CR408-208, 2008 WL 5332117, at *4 (S.D. Ga. Nov. 10, 2008), adopted as modified by 2008 WL 5332085, at *1 (S.D. Ga. Dec. 19, 2008).  "Nor was it unconstitutional for [Trooper Lundy] to ask questions about the occupants' comings and goings or question them separately, including removing [Jaramillo] from the vehicle."  Santillian, 2013 WL 4017167, at *7 (citations omitted).  Indeed, "[i]t is well established that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop."  United States v. Ellis, 497 F.3d 606, 614 n.1 (6th Cir. 2007) (citation and internal marks omitted); see also United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (citations omitted) (noting that a reasonable traffic stop investigation includes checking the driver's license, the vehicle's registration, inquiring about the occupants' destination, route, and purpose, and verifying the driver's story with passengers).  To that end, after briefly questioning Jaramillo at the rear of the Tahoe about his travel plans and whether he had rented the vehicle, Trooper Lundy informed him of the reason for the traffic

stop and then returned to the passenger side of the Tahoe and questioned Perez in order to corroborate Jaramillo's account, and he also obtained Perez's driver's license, see (Tr. at 6-7, 33-35, 61, 63; Def. Ex. 1, (File 1a) at 3:49-4:00, 4:29-5:46), all of which were within the permissible scope of a lawful traffic stop, see United States v. Burrows, No. CR 212–001, 2012 WL 4848994, at *3 (S.D. Ga. Oct. 11, 2012); see also Ellis, 497 F.3d at 613-14 (footnote and citations omitted) ("In obtaining the driver's driving license and vehicle registration, [the officer] was justified in asking the occupants general questions of who, what, where, and why regarding their . . . travel."); United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000) (citation and internal marks omitted) (finding "questions about travel plans are routine and may be asked as a matter of course without exceeding the proper scope of a traffic stop").

Because there was some inconsistency in defendants' travel plans and their stated purpose for travel, Trooper Lundy returned to Jaramillo and again briefly asked him about their travel destination before proceeding to his patrol vehicle and requesting a K-9 unit while entering defendants' information in the computer database and running their licenses and vehicle registration through GCIC. (Tr. at 6-9, 32, 35-37, 39-41, 43, 60; Def. Ex. 1, (File 1a) at 5:50-7:03; Def. Exs. 2 & 3). While waiting for the license and vehicle registration checks to come back, Trooper Lundy printed a speeding warning citation and a Spanish consent to search form on his

20

computer, and after he had completed these tasks, the licenses came back clean.  (Tr. at 9, 41-43; Gov. Ex. 2; Def. Exs. 2 & 3).  Trooper Lundy then exited his patrol car, approached Jaramillo, asked him how long he had been in Atlanta, explained that he was only going to issue him a warning for speeding, and then handed him his driver's license and warning citation.  (Tr. at 9-10, 39, 43-44; Def. Ex. 1, (File 1a) at 13:32-14:15).  Trooper Lundy then approached Perez, who was still seated on the passenger's side of the Tahoe, and returned his driver's license, explained that he was only going to issue them a warning citation, and asked him how long they had been in Atlanta and how old he was since he expressed that he was in Atlanta for his birthday.  (Tr. at 9-10, 44-46; Def. Ex. 1, (File 1a) at 14:16-15:22).  Trooper Lundy then turned back to Jaramillo and realized that he had left the rental agreement for the Tahoe in his patrol vehicle and went to retrieve it.  (Tr. at 9, 11, 47-48, 51-52; Def. Ex. 1, (File 1a) at 15:24-16:39).  After Trooper Lundy handed Jaramillo the rental agreement, he stated, "You all be careful," at which time only 16 minutes had passed since the initiation of the traffic stop.  (Tr. at 12, 48-49; Def. Ex. 1, (File 1a) at 16:38-16:44).  At this point, the traffic stop concluded and, as depicted on the video, "the duration of the traffic stop was properly limited to the time necessary to effectuate the purpose of the stop."  Ferguson, 2013 WL 3147945, at *7 (citation omitted).

21

Although defendants maintain that the "running of routine license and registration checks, which took four minutes, was put on hold while [Trooper] Lundy conducted his investigation," [Doc. 43 at 18-19 (footnote omitted)], Trooper Lundy's brief questioning of defendants was within the permissible scope of the lawful stop.  Even if the questions exceeded the proper scope of questioning, the issue is "whether the time it took [Trooper Lundy] to ask [d]efendant[s] about [their travel plans and purpose of travel] and for [d]efendant[s] to answer measurably extended or prolonged the duration of the stop so as to make it unreasonable under the Fourth Amendment." United States v. Dam, No. 3:12–cr–161–J–99MMH–MCR, 2012 WL 6827476, at *3 (M.D. Fla. Nov. 16, 2012), adopted by 2013 WL 126424, at *2 (M.D. Fla. Jan. 10, 2013) (citation and internal marks omitted).  "To answer this question, the Court should 'not simply look at the interval of prolongation in isolation, but rather assess the length of the stop as a whole, including any extension of the encounter, by undertaking a fact-bound, context-dependent analysis of all the circumstances concerning the stop and the unrelated questions.'" Id. (internal marks omitted) (quoting United States v. Griffin, 696 F.3d 1354, 1362 (11th Cir. 2012)).

Trooper Lundy's alleged unrelated questioning of defendants lasted at most approximately five minutes, see (Def. Ex. 1, (File 1a) at 2:34-3:32, 4:29-5:32, 5:50-6:12, 13:32-13:54, 14:16-15:22), and courts have found that similar periods of time did not

unreasonably extend the duration of the stop, see United States v. Derverger, 337 F. App'x 34, 36 (2d Cir. 2009) (unpublished) (citation omitted) (finding "five minutes of [unrelated] questioning did not significantly extend the time [defendant] was detained"). While defendants are correct in that there is no bright-line test regarding the reasonableness of the duration of a stop, see [Doc. 43 at 12, 14], the "overarching consideration in this inquiry is the officer's diligence in . . . ascertaining whether the suspected traffic violation occurred and . . . if necessary, issuing a ticket," and "context-framing inquiries related to the driver's travel history and travel plans or his authority to operate the vehicle will rarely suggest a lack of diligence." United States v. Campbell, No. 1:10–cr–16, 2010 WL 2838382, at *4 (E.D. Tenn. May 16, 2010), adopted by 2010 WL 2838380, at *3 (E.D. Tenn. July 19, 2010) (alteration, citation, and internal marks omitted). Having considered the context and circumstances of the encounter, the Court finds that Trooper Lundy's brief questioning of the defendants about their travel did not measurably extend the duration of the stop or prevent him from diligently completing the purpose of the lawful traffic stop, and under these circumstances, the 16-minute traffic stop was not unreasonable.[21] See Hernandez, 418 F.3d at 1209-10 (finding traffic stop based on probable cause for speeding that

---

[21] Having found that the duration of the traffic stop was reasonable and not unlawfully prolonged, the Court need not reach the issue as to whether Trooper Lundy had reasonable suspicion to prolong the traffic stop.

23

lasted 17 minutes prior to defendant's consent to search was not constitutionally unreasonable under the Fourth Amendment); see also United States v. Harrison, 606 F.3d 42, 44-45 (2d Cir. 2010) (per curiam) (ordering driver out of vehicle during lawful traffic stop and questioning him separate from the passengers about travel plans and then asking the passengers the same questions to see if they corroborated the driver's account and then returning and asking the driver additional questions did not prolong the stop so as to render it unconstitutional).

**B.    Consent to Search**

The subsequent search of the Tahoe was also lawful pursuant to both Jaramillo and Perez's voluntary consent. "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989) (citations omitted); see also Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Emanuel, 440 F. App'x 881, 883-84 (11th Cir. 2011) (per curiam) (unpublished); United States v. Reynolds, 526 F. Supp. 2d 1330, 1336 (N.D. Ga. 2007). "An officer conducting a routine traffic stop may request consent to search the vehicle." United States v. Lamela-Cardenas, Criminal Action No. 1:11–00122–KD–C, 2011 WL 3494562, at *5 (S.D. Ala. Aug. 10, 2011) (citations omitted). "In order for consent to a search to be deemed voluntary, it must be the

product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360 (citation omitted); see also United States v. Crump, Criminal Action File No. 4:10–CR–032–HLM–WEJ, 2011 WL 6153106, at *6 (N.D. Ga. Nov. 21, 2011), adopted by 2011 WL 6179211, at *8 (N.D. Ga. Dec. 12, 2011); United States v. Teague. No. 2:10–CR–006–RWS–SSC, 2010 WL 6529640, at *19 (N.D. Ga. Nov. 12, 2010), adopted by 2011 WL 1497876, at *1 (N.D. Ga. Apr. 19, 2011).

The government bears the burden of proving that consent was voluntary, United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995), and voluntariness of consent is determined on the basis of the totality of the circumstances, see Schneckloth, 412 U.S. at 227; Reynolds, 526 F. Supp. 2d at 1337.  Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found.  Purcell, 236 F.3d at 1281; see also United States v. Chaidez-Reyes, Criminal Action No. 1:13–CR–158–ODE–AJB, 2014 WL 547178, at *15 (N.D. Ga. Feb. 10, 2014), adopted at *1.

Jaramillo, as the driver of the Tahoe and the person whose name was on the rental agreement, had authority to consent to a search of the vehicle.  See United States v. Cooper, 133 F.3d 1394, 1400-01 (11th Cir. 1998); see also United States v.

25

Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999).[22]  Jaramillo asserts that it was evident that he did not speak or understand English well and that his verbal consent was therefore ineffective, and that although he provided written consent in Spanish, he was still confused about what was being asked of him and "did not even know why he was reading the form, appearing to believe that he was translating a document for [Trooper] Lundy's benefit."  [Doc. 43 at 28-31].[23]  Jaramillo also contends that Corporal Spitzer did not validly obtain his verbal consent to search.  [Id. at 31-32].

The evidence shows that Jaramillo, after initially indicating that he did not understand Trooper Lundy's verbal request for consent, subsequently consented after Trooper Lundy repeated himself, pointed to his eyes and the Tahoe, and stated, "Look in your vehicle."  (Tr. at 12-13, 50, 64; Def. Ex. 1, (File 1a) at 16:58-17:26).  Trooper Lundy then confirmed that Jaramillo could read Spanish and he had Jaramillo read aloud the consent to search form printed in the Spanish language,

---

[22] Perez argues that Jaramillo's consent to search was not voluntary, see [Doc. 42 at 1-4], but he does not have standing to contest the voluntariness of Jaramillo's consent to search the vehicle, see United States v. $14,000.00 In U.S. Currency, 211 F.3d 1270, at *3 n.4 (6th Cir. 2000) (unpublished); see also United States v. Gonzalez, 952 F. Supp. 813, 815-16 (M.D. Ga. 1997).  Nevertheless, since Jaramillo asserts the same argument, see [Doc. 43 at 26-32], the Court will address whether his consent to search the Tahoe was freely and voluntarily given.

[23] Jaramillo also argues that the government failed to provide information on his education, [Doc. 43 at 31]; however, his argument in this regard is without merit as the evidence shows that he was able to read and comprehend Spanish.  (Tr. at 13, 50-51, 64; Gov. Ex. 2; Def. Ex. 1, (File 1a) at 17:27-19:01).

which, after seeking clarification about the purpose of the form, Jaramillo indicated he understood and then signed.  (Tr. at 13, 19, 50-51, 64-65; Gov. Ex. 2; Def. Ex. 1, (File 1a) at 17:27-19:33).  Thus, the evidence shows that Jaramillo provided both oral and written consent to search the Tahoe.

"[I]n determining whether language skills inhibited an individual from providing voluntary consent, courts examine whether the individual interacted intelligently with the police." United States v. Hernandez, No. 1:13–cr–183–WSD, 2014 WL 869275, at *10 (N.D. Ga. Mar. 5, 2014), adopted at *4 (citations omitted). Although Jaramillo appeared to have some difficulty understanding Trooper Lundy, they were able to converse about Jaramillo's travel plans and the reason for the traffic stop, and Jaramillo "was forthright about his ability to understand Trooper [Lundy] and stated when he ([Jaramillo]) did not understand." United States v. Molina, No. 8:05CR339, 2006 WL 680884, at *4 (D. Neb. Feb. 10, 2006), adopted by 2006 WL 695454, at *1 (D. Neb. Mar. 10, 2006).  After asking Jaramillo for consent to search his vehicle, Trooper Lundy provided Jaramillo the written Spanish consent to search form, and Jaramillo did not appear confused about the consent after reading it aloud in its entirety.  In fact, Jaramillo specifically stated that he understood the form, see (Def. Ex. 1, (File 1a) at 19:01-19:33), and then agreed to sign it, (Gov. Ex. 2).  Thus, even assuming some confusion in understanding Trooper

Lundy's verbal request to consent due to a language barrier, "[a]ny language difficulty was addressed by providing [Jaramillo] with the written consent form in Spanish," United States v. De Alba-Reyes, Criminal Action No. 1:10–CR–286–JEC–ECS, 2011 WL 1457188, at *5 (N.D. Ga. Feb. 17, 2011), adopted by 2011 WL 1459484, at *1 (N.D. Ga. Apr. 15, 2011), and the "purported limitations on [Jaramillo's] understanding of English did not preclude him from making an essentially free and unconstrained choice to grant Trooper [Lundy's] request to search the [Tahoe]," United States v. Navarro, No. 2:09–CR–72–WKW, 2009 WL 2993863, at *3 (M.D. Ala. Sept. 17, 2009), adopted at *1 (internal marks omitted).

In addition, Corporal Spitzer arrived on the scene about five minutes after Jaramillo gave Trooper Lundy oral and written consent, and he conversed in Spanish with both Jaramillo and Perez, asked them whether there were drugs or large amounts of cash in the vehicle, and asked them for consent to search the vehicle. (Tr. at 16, 18, 52-53, 68, 70-74, 80, 83-84, 92-94; Def. Ex. 1, (File 1a) at 24:51-26:42). While Jaramillo contends that he did not affirmatively respond to Corporal Spitzer's request but merely shrugged his shoulders, there is no dispute that he had already read and signed the consent to search form, which clearly advised him that he was granting his consent to search the Tahoe, including any luggage, containers, and contents within the Tahoe and that he had the right to refuse consent or to sign

28

the form. See (Gov. Exs. 2 & 3). Therefore, any confusion regarding Jaramillo's understanding of Trooper Lundy's verbal and written request for consent was certainly made clear when Corporal Spitzer asked him for consent to search for a third time, and he did not refuse or revoke his previously given consent or seek to limit his consent in any way.[24] In short, the "uncontroverted testimony is that [Jaramillo] gave his consent to search the vehicle multiple times." United States v. Ziga, Criminal No. 09–00124, 2010 WL 3735729, at *5 (W.D. La. Aug. 27, 2010), adopted by 2010 WL 3747651, at *1 (W.D. La. Sept. 16, 2010).[25]

---

[24] Furthermore, "whether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." United States v. Aguilar, 743 F.3d 1144, 1147 (8th Cir. 2014) (alteration, citation, and internal marks omitted). That is, the "precise question is not whether [Jaramillo] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented," id. (citation and internal marks omitted), and here, the officers reasonably believed that Jaramillo consented to the search of the Tahoe.

[25] Perez argues that Jaramillo's consent did not extend to his locked luggage and that the officers never asked him for consent. See [Doc. 42 at 2]. While Trooper Lundy never specifically asked Perez for consent, he advised Perez that Jaramillo had consented to the search and while they awaited backup, Perez even asked Trooper Lundy whether he wanted him to open the rear hatch of the Tahoe. See (Def. Ex. 1, (File 1a) at 21:13-21:22). More important, the video recording clearly shows that prior to conducting any search of the Tahoe, Corporal Spitzer asked both Jaramillo and Perez for consent to search the Tahoe and that Perez responded, "yeah, that's fine." See (Def. Ex. 1, (File 1a) at 24:51-26:43). The officers proceeded to search the Tahoe and its contents, including Perez's luggage, which Perez unlocked for them without objection or any attempt to revoke or limit his consent. (Tr. at 56, 69, 78-79, 94-95); see generally (Def. Ex. 1); United States v. Alcantar, 271 F.3d 731, 738 (8th Cir. 2001) (citation and internal marks omitted) ("failing to object

Moreover, the length of detention prior to the consent "was not extraordinary" and "did not effect the voluntariness of the consent," Edenilson-Reyes, 2010 WL 5620439, at *13 (citing United States v. Brown, 223 F. App'x 875, 880 (11th Cir. 2007) (per curiam) (unpublished) ("finding that 20 to 25 minute period between stop and consent was 'not the kind of prolonged detention that might contribute to a coercive environment'")), and an officer may as a matter of course order the driver of a lawfully stopped vehicle to exit his vehicle, see Mimms, 434 U.S. at 106; United States v. Rodriguez, Criminal Case No. 1:10-CR-0407-TWT-JFK-3, 2011 WL 5191805, at *10 (N.D. Ga. Sept. 23, 2011), adopted by 2011 WL 5191798, at *1 (N.D. Ga. Oct. 31, 2011) (citations omitted); United States v. Espinal, Criminal Case No. 1:11-cr-00060-ODE-RGV, 2011 WL 7004195, at *9 n.12 (N.D. Ga. Aug. 29, 2011), adopted by 2012 WL 92451, at *3 (N.D. Ga. Jan. 10, 2012) (citation omitted).  Although Perez points out that he and Jaramillo were "[s]urrounded by ten officers with firearms" when asked for either consent or to open the luggage, see [Doc. 42 at 8], the record shows that defendants remained

---

to the continuation of a consent search makes the continued search objectively reasonable").  Additionally, although Perez was not explicitly advised of his right to refuse consent, the "failure to advise [him] of his right to refuse to consent will not invalidate an otherwise valid consent to search."  Chaidez-Reyes, 2014 WL 547178, at *15 (citations omitted); see also United States v. Pedraza-Bucio, No. 2:08 CR 698(TC), 2009 WL 1110332, at *6 (D. Utah Apr. 23, 2009) (citations omitted) ("Law enforcement is not required to advise individuals that they do not have to consent or that they may terminate consent once it is given.").

unrestrained at all times and that no officer made any threats or promises, used any force, or had their firearms drawn during the incident.  (Tr. at 19, 74-75, 80); see generally (Def. Ex. 1).

Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that the defendants freely and voluntarily consented to a search of the Tahoe.  See Brown, 223 F. App'x at 880; United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993); Garcia, 890 F.2d at 361; United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983).  From the moment Trooper Lundy began interacting with both defendants, they were cooperative and during the search neither defendant voiced any objections, nor did they rescind their consent in any way.  See generally (Def. Ex. 1).  Finally, "once [defendants] gave [the officers] consent to search [the] vehicle, [they] also provided consent to prolong the traffic stop."  Lamela-Cardenas, 2011 WL 3494562, at *7 (citation omitted).[26]

---

[26] The video recording also shows that after Jaramillo gave his consent to search the Tahoe and Trooper Lundy had Perez exit the vehicle, Trooper Lundy specifically asked defendants if they minded if he searched them and they consented.  See (Def. Ex. 1, (File 1a) at 20:36-21:35).  He then patted them down and explained that he was waiting for backup to begin searching the Tahoe.  See (id.).  Trooper Lundy again stated that he would try to get them out of there as quick as he could.  Although Jaramillo argues that this frisk was unconstitutional, defendants have not presented any evidence to contradict that they consented to the search of their person, or that this consent was anything other than knowing and voluntary.  See United States v. Smalls, No. 2:09-cr-1339-PMD, 2013 WL 267768, at *4 (D.S.C.

## C.     Defendants' Statements

Generally, the government may not use statements obtained as a result of custodial interrogation by law enforcement officers unless the government "'demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'"  United States v. Lueck, 678 F.2d 895, 899 n.2 (11th Cir. 1982) (quoting Miranda, 384 U.S. at 444).  "An officer's obligation to administer Miranda warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'"  United States v. de los Santos, No. 1:05-cr-372-WSD, 2007 WL 2331070, at *5 (N.D. Ga. Aug. 13, 2007) (citations and internal marks omitted); Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994) ("A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.") (citing Miranda, 384 U.S. at 444); see also United

---

Jan. 24, 2013).  Furthermore, although Jaramillo points out that he was frisked again by Officer Torres and a third time by another agent, see [Doc. 43 at 34], and the government has not made any arguments with regard to any of the pat down searches at issue, "[e]ven supposing [he] articulated a sound basis for a wrongful pat-down search, this Court reasons that [it is] not germane here" as "[t]here is no indication that [any officer] located any incriminating evidence on [either] defendant . . . or that any evidence is due to be suppressed as fruits of the poisonous tree as a result of the pat-down," United States v. Asghedom, No. 12–501–LSC–TMP, 2014 WL 197683, at *4 n.1 (N.D. Ala. Jan. 15, 2014), adopted at *1 (citation and internal marks omitted); see also (Tr. at 88-89 (Corporal Spitzer's testimony that he didn't believe anything was seized off of defendants' persons).

States v. Maldonado, No. 13–12279, 2014 WL 1345105, at *1 (11th Cir. Apr. 7, 2014) (per curiam) (unpublished).  Thus, "*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal marks omitted).  Defendants bear the burden of establishing that they were in custody and that their statements were made in response to government questioning. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).[27]  The government bears the burden of proving that defendants' statements were voluntarily given.  Colorado v. Connelly, 479 U.S. 157, 168 (1986).

Defendants argue that their statements should be suppressed "as a product of the Fourth Amendment violation which occurred by [Trooper] Lundy's unlawful investigative detention [and] also because [they were] questioned in a custodial environment without Miranda warnings[.]"  [Doc. 43 at 32 (citation omitted)].[28] Specifically, Jaramillo argues that he was frisked multiple times and that "two frisks and two warrantless search[es] of his person [] demonstrates a custodial environment" and that a "reasonable suspect in [his] position objectively would

---

[27] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

[28] Having already found that there was no Fourth Amendment violation in relation to the traffic stop itself, Jaramillo's fruit of the poisonous tree argument fails.

have felt that he was in custody" since he "was surrounded by a dozen agents who emptied the Tahoe of all of its contents during a three-hour search" during which he "was never left unattended and was frisked and searched multiple times." [Id. at 35].

Miranda warnings do not generally need to be given during Terry stops or general traffic stops. See United States v. Acosta, 363 F.3d 1141, 1148-49 (11th Cir. 2004) (citing Berkemer v. McCarty, 468 U.S. 420, 435-37 (1984)). Although a driver detained during a typical traffic stop is not free to leave, the Supreme Court "recognized two key factors which, in the context of a traffic stop, mitigate the pressures upon a detained person so that his ability to exercise his privilege against self incrimination is not so impaired that he need be warned of his constitutional rights under Miranda." Id. at 1149 (quoting Berkemer, 468 U.S. at 437). "First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief," since traffic stops ordinarily last only a few minutes and differ from a stationhouse interrogation, "which frequently is prolonged, and . . . the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." Id. (internal marks omitted) (quoting Berkemer, 468 U.S. at 437). Second, most traffic detainees would not feel "completely at the mercy of the police," as the inherent authority of armed police officers is "more than offset by

other aspects of such a stop." Id. at 1149-50 (citation and internal marks omitted) (i.e., passersby witnessing the interaction).  A stopped motorist is considered "in custody" if he is "subjected to treatment that renders him 'in custody' for practical purposes." Berkemer, 468 U.S. at 440. United States v. Crawford, 294 F. App'x 466, 473 (11th Cir. 2008) (per curiam) (unpublished).

Neither of defendants' statements are due to be suppressed because they were not in custody when questioned by law enforcement at the scene.  The Tahoe had been pulled over by Trooper Lundy, who had probable cause to stop the vehicle. At no time during the traffic stop or subsequent search were defendants restrained in any way and neither of them were told that they were under arrest.  While the search of the Tahoe lasted approximately three hours during which defendants were subjected to pat down searches, the video recording shows that any questioning was brief, that defendants were stopped on the side of a busy highway, they were not questioned at gunpoint or forced to lie down, that no physical force was used against them, they were not handcuffed or told they were under arrest, they were not placed in a police car before or during questioning, and that they were allowed to leave the scene once the search of the Tahoe was concluded.[29] See generally (Def.

---

[29] The mere fact that the traffic stop "occurred at night does not, by itself, create such a coercive atmosphere of questioning as to place a [d]efendant in custody for *Miranda* purposes." United States v. Sifuentes-Botello, No. 2:13–cr–90–FtM–38CM, 2014 WL 348547, at *10 (M.D. Fla. Jan. 31, 2014), adopted at

Ex. 1); see also Acosta, 363 F.3d at 1149-50; (Tr. at 127, 158-59).  There had not been such a "restriction on [defendants'] freedom as to render [them] in custody." de los Santos, 2007 WL 2331070, at *5 (citations omitted).  Moreover, the absence of coercive influences on defendants indicates that their statements were voluntarily made.  See Connelly, 479 U.S. at 168.  Thus, the Court finds that defendants' statements were not taken in violation of Miranda, and are not due to be suppressed.

## III.  CONCLUSION

For the foregoing reasons and cited authority, Perez's motion to adopt, [Doc. 28], is **GRANTED**, and it is hereby **RECOMMENDED** that defendants' motion to suppress evidence and statements, [Doc. 27], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 25th day of April, 2014.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

*1.  Indeed, "[t]here is no evidence showing that the location of the traffic stop was not visible to passing motorists." Id.; see also (Def. Ex. 1).  "Neither would the mere fact that a pat-down search was conducted so elevate the encounter." United States v. Pedroza, No. 99 CR 192, 2000 WL 286890, at *6 (N.D. Ill. Mar. 10, 2000) (citation omitted).